**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

SANTAE A. TRIBBLE,                                                )
    210 Oakwood St., S.E, Unit 206                  )
    Washington, D.C. 20032                          )
                     Plaintiff,     )
       v.                                        )        Civil Action No.  15-710
                                                    )
Detective RAYMOND JEFFREY GREENE, Detective       )
THOMAS J. KILCULLEN, the Estate of Thomas J.      )
Kilcullen, Frances L. Kilcullen as the Personal   )
Representative or Executor of the Estate of Thomas J. )
Kilcullen, any unknown personal Representative or )
Executor of the Estate of Thomas J. Kilcullen, any )
unknown heirs and devisees of Thomas J. Kilcullen; )    **COMPLAINT**
Detective LORREN D. LEADMON, Detective            )
MENDEZ, Officer MARTIN J. MEEHAN, Detective       )    JURY TRIAL DEMANDED
JAMES R. HANSON, Detective WILLIAM R. WOOD,       )
Detective C.L. MUSE, Sergeant RAYMOND DWYER,      )
Officer JOSEPH MASSON, the Estate of Joseph       )
Masson, the unknown personal representative or    )
executor of the Estate of Joseph Masson, any unknown )
heirs and devisees of Joseph Masson, Detective SKIP )
VOORHEES, Detective GEORGE R. WILSON, the         )
Estate of George R. Wilson, the unknown personal  )
representative or executor of the estate of George R. )
Wilson, any unknown heirs and devisees of George R. )
Wilson,                                           )
    Metropolitan Police Headquarters                )
    300 Indiana Ave., NW                            )
    Washington, D.C., 20001,                        )
                                                    )
 BOBBY JEAN BESS,                                 )
    1475 Euclid St., NW, Apt 102                    )
    Washington, D.C., 20009,                        )
                                                    )
RONALD MARVIN WILLIS,                             )
    4230 Livingston Rd., SE, Apt 3                  )
    Washington, D.C., 20032,                        )
                                                    )
and the DISTRICT OF COLUMBIA,                     )
   1350 Pennsylvania Ave., N.W., Suite #419,        )
   Washington, D.C., 20004,                         )
                   Defendants.     )

## **COMPLAINT**

Plaintiff SANTAE A. TRIBBLE, by his attorneys NEUFELD SCHECK & BRUSTIN, LLP, and JEFFREY S. GUTMAN, hereby alleges as follows:

### Introduction

1.      Plaintiff Santae A. Tribble spent nearly 28 years in prison for a crime he did not commit.

2.      In August 1978, when Mr. Tribble was just seventeen years old, he was arrested and incarcerated for the murder of John W. McCormick, who was killed during the course of an armed robbery on his doorstep in southeast Washington, D.C, by an unknown man who wore a stocking mask.

3.      Mr. Tribble is innocent of the McCormick murder. He had nothing to do with the crime. He has no knowledge of the real perpetrator.

4.      Mr. Tribble was arrested and charged with the McCormick homicide, despite his innocence, due to misconduct by District of Columbia Metropolitan Police Department (MPD) officers. MPD officers coerced and otherwise manipulated a woman named B.J. Phillips into falsely claiming that Mr. Tribble had confessed to her. MPD officers also misrepresented and fabricated forensic ballistics evidence that was claimed to inculpate Mr. Tribble in the McCormick homicide, despite the fact that other ballistics evidence—not disclosed by the officers—exculpated him.

5.      The prosecution's evidence against Mr. Tribble with respect to the McCormick murder presented at trial featured B.J. Phillips' false and coerced account that Mr. Tribble had confessed and the tainted ballistics evidence. In addition, after his arrest by the MPD, the Federal Bureau of Investigation falsely reported, and an examiner falsely testified at trial, that one of the

hairs found on the stocking mask worn by the perpetrator during the McCormick robbery matched Mr. Tribble's hair in all characteristics, and thus could be Mr. Tribble's hair.

6.      Despite the fact that Mr. Tribble presented strong alibi evidence that he was at home at his mother's apartment during the McCormick murder, and adamantly denied committing the crime or confessing to B.J. Philips, the MPD officers' misconduct caused Mr. Tribble to be convicted of the McCormick homicide for which he was sentenced to a term of imprisonment of 20 years to life.

7.      In 2011, DNA testing of the hairs found in the true perpetrator's stocking mask conclusively demonstrated that *none* of the hairs were Mr. Tribble's.

8.      In 2012, following these DNA results, a D.C. Superior Court judge vacated Mr. Tribble's convictions and dismissed the indictment against him with prejudice. The judge subsequently awarded Mr. Tribble a Certificate of Innocence, finding that he was actually innocent of the murder and armed robbery of Mr. McCormick.

9.      Just seventeen years old when he was arrested, Mr. Tribble spent the most formative years of his life in prison, separated from his family and friends, including his young son, and robbed of the most basic of freedoms. He served over 27 years in prison and over eight years on parole for the McCormick homicide, a crime he did not commit. He files this civil rights action to bring the Defendants' misconduct to light, to ensure that they are held accountable for their actions, and to seek justice for the many years of his life that he lost for a crime he did not commit.

<u>Jurisdiction</u>

10.      This action is brought pursuant to the Fifth Amendment to the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

3

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343.

12.     Venue is proper under 28 U.S.C. § 1391(b).  The events giving rise to the claims asserted herein occurred in this judicial district and Defendant District of Columbia is a municipal corporation located here.

Parties

13.     Plaintiff Santae A. Tribble was at all times relevant to this Complaint, and is currently, a citizen and resident of the District of Columbia.

14.     Detective Raymond Jeffrey Greene was, at all times relevant to this Complaint, a duly appointed and acting detective with the MPD's Homicide Squad, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity.

15.     Detective Thomas J. Kilcullen was, at all times relevant to this Complaint, a duly appointed and acting detective with the MPD's Homicide Squad, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity. As Mr. Kilcullen is deceased, Plaintiff also names the Estate of Thomas J. Kilcullen, Frances L. Kilcullen as the personal representative or executor of the Estate of Thomas J. Kilcullen, any unknown personal representative or executor of the Estate of Thomas J. Kilcullen, and any unknown heirs and devisees of Thomas J. Kilcullen.

16.     Detective Lorren D. Leadmon was, at all times relevant to this Complaint, a duly appointed and acting detective with the MPD's Sixth District, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity.

4

17.     Detective Mendez (first name unknown) was, at all times relevant to this Complaint, a duly appointed and acting detective with the MPD's Sixth District, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity.

18.     Officer Martin J. Meehan was, at all times relevant to this Complaint, a duly appointed and acting police officer with the MPD's Sixth District, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity.

19.     Detective James R. Hanson was, at all times relevant to this Complaint, a duly appointed and acting detective with the MPD's Sixth District, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity.

20.     Detective William R. Wood was, at all times relevant to this Complaint, a duly appointed and acting detective with the MPD's Sixth District, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity.

21.     Detective C. L. Muse was, at all times relevant to this Complaint, a duly appointed and acting detective with the MPD's Sixth District, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity.

22.     Sergeant Raymond Dwyer was, at all times relevant to this Complaint, a duly appointed and acting police sergeant and supervisor with the MPD's Sixth District, acting within

the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity.

23.     Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson, Woods, Muse, and Dwyer are referred to collectively as "Defendant MPD officers."

24.     Officer Joseph Masson was, at all times relevant to this Complaint, a duly appointed and acting officer with the MPD's Firearms Examination Section, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity. As Mr. Masson is deceased, Plaintiff also names the Estate of Joseph Masson, the unknown personal representative or executor of the Estate of Joseph Masson, and any unknown heirs and devisees of Joseph Masson.

25.     Detective Skip Voorhees was, at all times relevant to this Complaint, a duly appointed and acting detective with the MPD's Firearms Examination Section, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity.

26.     Detective George R. Wilson was, at all times relevant to this Complaint, a duly appointed and acting detective supervisor with the MPD's Firearms Examination Section, acting within the District of Columbia and under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the District of Columbia.  He is sued in his individual capacity. As Mr. Wilson is deceased, Plaintiff also names the Estate of George R. Wilson, the unknown personal representative or executor of the Estate of George R. Wilson, and any unknown heirs and devisees of George R. Wilson.

27.     Defendants Masson, Voorhees, and Wilson are referred to collectively as "Defendant ballistics officers."

28.     Defendant Bobby Jean Bess, formerly known as Bobby Jean ("B.J") Phillips, was at all times relevant to this Complaint, and is currently, a citizen and resident of the District of Columbia. Her actions at issue in this Complaint took place within the District of Columbia. Because Ms. Bess was known as B.J. Phillips at the time of the incidents giving rise to this Complaint, this Complaint refers to Ms. Bess as B.J. Phillips.

29.     Defendant Ronald Marvin Willis was at all times relevant to this Complaint, and upon information and belief is currently, a citizen and resident of the District of Columbia. His actions at issue in this Complaint took place within the District of Columbia.

30.     Defendant District of Columbia, a municipal corporation, was at all times relevant to this Complaint the employer of the individual defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson, Wood, Muse, Dwyer, Masson, Voorhees, and Wilson, and is and was at all times relevant to this Complaint responsible for the policies, practices and customs of the Metropolitan Police Department ("MPD") and the training, supervision and discipline of MPD employees.

<u>Jury Demand</u>

31.     Plaintiff Santae Tribble requests a jury trial on all issues and claims so triable.

<u>Facts</u>

**The Crime**

32.     On July 26, 1978, at approximately 3:00 a.m., John W. McCormick was killed during the course of an armed robbery on his doorstep in Southeast Washington, D.C. Mr. McCormick, a taxi cab driver, had just returned home from working the night shift. As he did

each night, he parked his car on the street, locked the proceeds from his shift in the trunk, and then walked home. But when he got to his porch he was approached by an armed robber. Mr. McCormick's wife awoke and, through the window, heard her husband say, "I gave you all my money, I don't have any more." She called the police. When the police arrived, they found Mr. McCormick on the floor of the porch, his pockets turned out, with a fatal gunshot wound to the chest.

33.     Before she called the police, Ms. McCormick was able to get a glimpse of her husband's attacker from the window. But she could say only that the perpetrator was a black male, wearing dark clothing, no more than 5'7" tall (her husband's height), and wearing a stocking mask on his face. She thus had not seen his face and reported that she would not be able to identify anyone. Later that morning, a Metropolitan Police officer found the stocking mask that had been used by the perpetrator near the McCormick house.  The MPD also recovered the bullet which killed Mr. McCormick.

34.     Santae Tribble had absolutely nothing to do with the McCormick homicide and robbery. He was not even in Washington D.C. when it occurred. Instead, he was asleep at his mother's apartment in Seat Pleasant, Maryland, having spent the evening there celebrating the birthday of a family friend.

**The Early Investigation**

35.     MPD officers quickly suspected the McCormick homicide could be linked to another robbery/homicide, which took place a few blocks away just two weeks earlier.

36.     On July 13, 1978, at about 2:30 a.m., a man named William Horn was robbed and shot near his house in Southeast Washington, D.C. Like McCormick, Horn was robbed after coming home late at night. He parked his car down the street, and was robbed and shot while

walking home. Although neighbors heard the encounter, and an off-duty MPD officer who lived nearby and was arriving home at the same time saw Mr. Horn collapse, no one had actually seen the shooting or observed the true perpetrator.  The MPD recovered the bullet which killed Mr. Horn.

37.     Shortly after the Horn homicide, Defendant Joseph Masson, who was assigned to the MPD's Firearms Examination Section as a firearms examination and identification expert, concluded that the bullet recovered from Mr. Horn was fired from a revolver made by one of three manufacturers: H & R, Iver Johnson, or Hopkins & Allen.

38.     Santae Tribble did not kill Mr. Horn and had nothing to do with the Horn murder and robbery. He has no knowledge of the true perpetrator.

39.     Defendants Jeff Greene and Thomas Kilcullen of the MPD's Homicide Bureau and Defendant Lorren Leadmon of the Sixth District were assigned to investigate the Horn homicide.

40.     The day after the McCormick homicide, the MPD Firearms Examination Section compared the bullet that killed Mr. Horn with the bullet that killed Mr. McCormick, and reported that the two men were shot with the same .32 caliber gun. Defendant Skip Voorhees, who was assigned to the MPD's Firearms Examination Section as a firearms examination and identification expert, believed the murder weapon was more likely an Iver Johnson than the other two potential makes of guns.  With this information, Defendants Greene, Kilcullen, and Leadmon began investigating the McCormick homicide as well, assuming that both men were killed by the same assailant.

41.     In the course of their investigation the Horn and McCormick homicides, Defendants Greene and Kilcullen, who were homicide detectives, enlisted the help of officers

from local police districts who were more familiar with individuals in the neighborhood. Those

officers included Defendant Leadmon, who was officially assigned to investigate the case, and

other Sixth District officers, including Defendant Leadmon's partner Defendant Mendez;

Defendant Wood and his partner Defendant Muse; Defendant Meehan; Defendant Hanson; and

their supervisor, Defendant Dwyer.

42.     Upon information and belief, residents in the neighborhood were very concerned

about the high volume of armed robberies that had been occurring in the area, especially the

unsolved McCormick and Horn murders. Defendants Greene, Kilcullen, and Leadmon, along

with the other officers assisting their investigation—including Defendants Mendez, Muse,

Wood, Hanson, Meehan, and Dwyer—faced pressure to solve the McCormick and Horn cases.

43.     Defendants Greene, Kilcullen, and Leadmon, with assistance from the other MPD

officers, investigated for weeks following the Horn and McCormick homicides, but failed to

adequately pursue leads to solve these cases or to generate any serious leads that they regarded as

more promising.   For several days, Defendants Greene, Kilcullen, Leadmon, and other MPD

officers, resorted to simply stopping, and spot checking dozens of individuals on the street in the

area where the murders had occurred. But none of this activity brought them any closer to

solving the case.

**Police Believe They Catch a Break and Work to Build a Case Around Mr. Tribble**

44.     Defendant B.J. Phillips lived just down the street from the Horn murder and close

to the McCormick murder.

45.     Defendant B.J. Phillips was well known to several local Sixth District officers

before August 1978. She frequently gave officers, including Defendant Leadmon and Defendant

Meehan, a canine patrol officer in the Sixth District who frequently interacted with Defendant

Phillips, information in exchange for favors and, upon information and belief, money. She also engaged in prostitution. In exchange for her information, officers gave Defendant Phillips leniency and assisted her in avoiding arrest.

46.     But Defendant Phillips frequently lied: she had a reputation as a dishonest and untrustworthy person. Defendant Phillips has even admitted to lying under oath in this case. Defendant MPD Officers who knew her must have been aware of Defendant Phillips' propensity to lie and reputation for dishonesty.

47.     Among MPD officers, including upon information and belief, Defendants Greene and Kilcullen, Defendant Leadmon had his own reputation: he was known as an officer who relied heavily on the use of paid informants.

48.     The other MPD Defendant officers, including Defendants Greene and Kilcullen, referred to Defendant B.J. Phillips as "Leadmon's girl" and a "plant," *i.e.*, a person planted in the community that provided information to police.

49.     Shortly after the McCormick homicide, Defendant Meehan and, upon information and belief other Defendant MPD officers, asked Defendant Phillips if she had information regarding the recent homicides. Defendant Meehan thereafter asked Ms. Phillips repeatedly for information about the Horn and McCormick homicides. She initially did not provide the police with any information.

50.     In early August 1978, however, Defendant B.J. Phillips gave Defendant Meehan a spent .32 caliber shell casing. Defendant Meehan was aware of both murders, knew that they were unsolved, and knew that a .32 caliber weapon had been used in those crimes.

51.     After Defendant Phillips gave Defendant Meehan the shell casing, he turned it over to other Sixth District Officers. Those officers, including Defendant Leadmon, questioned Defendant Phillips.

52.     Defendant Phillips eventually told MPD officers, including Defendants Leadmon, Greene, and Kilcullen, that the shell casing she gave Defendant Meehan came from the test fire behind her apartment of a .32 caliber gun that was sold by Santae Tribble and Cleveland Wright to Phillips and her friend Brenda McLean.

53.     Defendant Phillips eventually gave Defendant Leadmon the gun. Upon information and belief, the other Defendant MPD officers and other Defendant ballistics officers were aware that B.J. Phillips had given Defendant Leadmon the gun and that the gun was in the MPD's possession.

54.     After learning that Mr. Tribble and Mr. Wright sold a .32 caliber gun to Ms. Phillips and Ms. McLean, officers suspected Mr. Tribble and Mr. Wright had a connection to the Horn and McCormick murders.

55.     In reality, however, neither Mr. Tribble nor Mr. Wright had anything to do with the Horn or McCormick homicides or robberies. Indeed, the gun was sold in early July before those crimes ever took place, and was not in their possession at the time of those crimes.

56.     Defendant MPD officers, including Defendants Greene, Kilcullen, Leadmon, Mendez, Hanson, Wood, and upon information and belief, Muse and Dwyer, acting individually and/or in concert, attempted to obtain confessions from Mr. Tribble and Mr. Wright.

57.     MPD officers brought Mr. Tribble into custody, where Defendants Greene, Kilcullen, Hanson, and upon information and belief, Leadmon, Wood, Muse, and Dwyer, aggressively questioned him over the course of an entire night. Defendant MPD officers lied to

him during that interrogation by telling him that Mr. Wright was making statements implicating

him. Mr. Tribble, who was completely innocent and knew nothing about the murders,

consistently and truthfully denied any involvement in the crimes. In response to his truthful

denials, Defendant MPD officers, including Defendants Greene, told Mr. Tribble that he should

tell them what they want to hear, and falsely promised him leniency if he would provide an

inculpatory statement against Mr. Wright. Despite Defendant officers' coercive tactics, Mr.

Tribble steadfastly asserted his innocence, and truthfully and repeatedly told the officers that he

did not know anything about the murders.

58.     Defendant MPD officers used similar tactics during their interrogation of Mr.

Wright. Mr. Wright, who was also completely innocent and did not know anything about the

murders, consistently and truthfully denied any involvement in the crimes.

**MPD Defendants Coerce and Induce B.J. Phillips to Provide A False Inculpatory
Statement that Leads to Mr. Tribble's Arrest**

59.     After learning about the gun sale from Defendant B.J. Phillips, Defendant MPD

officers interrogated her repeatedly about the Horn and McCormick homicides and the gun sale.

60.     Defendant Phillips showed Defendant MPD officers a notebook that she had been

keeping, in which she recorded dates related to the gun sale that demonstrated it was sold in early

July.

61.     Eventually, however, MPD Defendant Officers, including Defendants Greene,

Kilcullen, Leadmon, Mendez, Hanson, Wood, Muse, Meehan, and Dwyer, acting individually

and/or in concert, coerced, manipulated, and/or induced Ms. Phillips into signing two witness

statements falsely implicating Mr. Tribble in the Horn and McCormick homicides.

62.     Defendants' coercion included threats that Ms. Phillips would be charged with

obstruction of justice, contempt, and as an accessory, if she did not assist them. They harassed

her, questioning her about her relationship with Ms. McLean, showing her private, nude photos of her and Ms. McLean that the police had obtained. And Defendants, including Defendant Leadmon, falsely promised her that she would not have to be involved in this case if she gave them the information against Mr. Tribble that they wanted.

63.     Defendant MPD officers, including Defendants Greene, Kilcullen, and Leadmon, also served Ms. Phillips with a "subpoena" to meet with the "DA." This tactic—issuing a "subpoena" to meet with the prosecutor that had no legal force—had been condemned as unprofessional and unethical by the courts years earlier.

64.     In addition to threatening Defendant Phillips, Defendant MPD officers, including at least Defendants Greene and Kilcullen, offered her a substantial reward to induce her to make statements inculpating Mr. Tribble. The reward, which had been provided by the family of Mr. McCormick, totaled approximately $4,000. Defendant MPD officers gave Defendant Phillips some or all of this reward.

65.     The two statements that Defendant B.J. Phillips ultimately signed implicating Mr. Tribble in the Horn and McCormick murders, which reported admissions Mr. Tribble allegedly made to those murders, were completely false. Mr. Tribble is innocent, has always truthfully maintained his innocence, and has never made any statements to the contrary to anyone, including Defendant Phillips.

66.     Defendant Phillips, acting in concert with Defendant MPD Officers, agreed to lie in her written statements, in oral conversations to prosecutors, and at the grand jury and at trial, in exchange for money, leniency, other promises, and/or fear of the Defendant MPD officers' coercion and threats.

67.     Mr. Tribble was arrested for the Horn murder on August 15, 1978, two days after Defendant MPD officers secured Defendant Phillips' first false and coerced statement, which implicated Mr. Tribble in the Horn homicide only. In that signed statement, dated August 13, 1978, Defendant Phillips stated that she had no information implicating Mr. Tribble in any other crimes.

68.     Mr. Tribble was released on his own recognizance the morning of August 17, 1978.

69.     That same day, August 17, 1978, Defendant MPD officers, including Defendants Greene, Leadmon, and, upon information and belief, Kilcullen, again interrogated Defendant Phillips. Despite Defendant Phillips' statement on August 13 that she had no information implicating Mr. Tribble in any other crimes, using coercion, manipulation, and/or inducements, Defendant MPD officers obtained a second statement from Defendant Phillips that implicated Mr. Tribble in the McCormick murder as well. That statement was reduced to writing on August 18, 1978.

70.     On the evening of August 18, 1978, Mr. Tribble was arrested for the McCormick homicide.

71.     Upon information and belief, Defendant MPD officers including Defendants Kilcullen, Greene, and Leadmon, falsely represented to prosecutors that Defendant Phillips' statements were voluntary, free from any coercion and/or manipulation, and that they had not offered or given her a substantial reward.

72.     Upon information and belief, MPD Defendant Officers, including Defendants Greene, Kilcullen, and Leadmon, acting individually and/or in concert, coerced and/or manipulated Defendant Phillips to alter her notebook, described in Paragraph 60, *supra*, to show,

falsely, that Mr. Tribble had participated in the sale of the gun in August, after the murders, rather than what was actually the case—that the sale of the gun was in July, before the murders. Defendant Phillips changed each July date to an August date by crossing out the 7's and substituting them for 8's, at the direction of and/or acting in concert with Defendant MPD officers. Ms. Phillips threw this notebook away before trial, upon information and belief at the direction of and/or in concert with Defendant MPD officers.

73.     Defendant MPD officers, including Defendants Greene, Kilcullen, and Leadmon, acting individually and/or in concert, also, upon information and belief, coerced and/or manipulated Defendant Phillips to falsely maintain that the gun Mr. Wright and Mr. Tribble sold her and Ms. McLean had disappeared when she, in fact, had given the gun to Defendant Leadmon.  Defendant MPD Officers did not disclose to prosecutors or the defense that they had taken possession of the gun.

74.     Defendant MPD officers, including Defendants Greene, Kilcullen, Leadmon, Mendez, Hanson, Wood, Muse, Meehan, and Dwyer, acting individually and/or in concert, never disclosed to prosecutors or the defense the coercive and manipulative tactics and/or inducements used to obtain Defendant Phillips' statements implicating Mr. Tribble in the homicides, including:

> a.   that Defendant MPD officers had threatened Defendant Phillips with prosecution for contempt; in fact, Defendant Phillips testified falsely at trial that officers had not threatened her with charges;
>
> b.   that Defendant Phillips kept the notebook described in Paragraph 60, *supra*, that recorded the date of the gun sale in July, and that Defendant MPD officers had, upon information and belief, coerced and/or manipulated Defendant Phillips into

changing the dates in her notebook to falsely report that the gun sale occurred in August;

c.   or, that Defendant MPD officers had given Defendant Phillips some or all of the $4,000 reward offered by Mr. McCormick's family.

75.   Upon information and belief, Defendant MPD officers, including Defendants Greene, Kilcullen, Leadmon, Mendez, Hanson, Wood, Muse, Meehan, and Dwyer, knew that Defendant Phillips' statements implicating Mr. Tribble were false but did not report this information to prosecutors or the defense.

**Officers Coerce a Second Witness to Implicate Mr. Tribble**

76.    Upon information and belief, Defendant MPD officers used the same tactics of coercion, manipulation, and/or promises of leniency to coerce another individual to provide false inculpatory evidence against Mr. Tribble.

77.   At the same time as the Horn and McCormick investigation, Defendant MPD officers were investigating sixteen-year-old Defendant Ronald Willis for a failed armed robbery he had committed at a restaurant located near the Horn and McCormick murders. Defendant Willis had attempted to rob that restaurant at gunpoint; during the crime, the gun went off and injured a restaurant employee. He was identified by the victim, charged, and admitted the crime. He faced a potential life sentence.

78.   Defendant Willis had lived in the same Southeast neighborhood where Santae Tribble and Cleveland Wright grew up, and the three knew each other. Defendant Leadmon told the homicide detectives, Defendants Greene and Kilcullen, that he believed Willis would talk against Mr. Tribble and Mr. Wright.

79.     Defendant MPD Officers, including at least Defendants Kilcullen, Greene, Leadmon, and Hanson, acting individually and/or in concert, interrogated sixteen-year-old Defendant Willis over the course of many hours, outside the presence of counsel.  Upon information and belief, using threats, manipulation, and/or promises of leniency, Defendant MPD officers, including Defendants Kilcullen, Greene, Leadmon, and Hanson, acting individually and/or in concert, coerced and/or manipulated Ronald Willis to make statements implicating Mr. Tribble and Mr. Wright in the Horn and McCormick murders.

80.     Defendant MPD officers, including Defendants Kilcullen, Greene, Leadmon, and Hanson, acting individually and/or in concert, untruthfully told  Defendant Willis that Mr. Tribble and Mr. Wright said that he was involved in the murders. Upon information and belief, Defendant officers, including Defendants Kilcullen, Greene, Leadmon, and Hanson, acting individually and/or in concert, used similar coercion, manipulation and/or inducements with Defendant Willis as they had used with Defendant Phillips. Upon information and belief, Defendant officers, including Defendants Kilcullen, Greene, Leadmon, and Hanson, acting individually and/or in concert, also promised Willis leniency with his armed robbery charges in exchange for his cooperation.

81.     Defendant Willis ultimately signed statements written by Defendant MPD officers that falsely reported that Mr. Tribble had made admissions to him regarding the Horn and McCormick murders.

82.     Upon information and belief, Defendant MPD officers, including Defendants Kilcullen, Greene, Leadmon, and Hanson, knew that the statements Defendant Willis signed implicating Mr. Tribble and Mr. Wright in the Horn and McCormick murders were false. But none of the Defendant MPD officers ever disclosed this fact to prosecutors or the defense. Nor

18

did Defendant officers disclose the coercion, manipulation, and/or inducements and promises used to obtain Defendant Willis' statements. Instead, they represented falsely to prosecutors that Defendant Willis' statements were voluntary, reliable, and not the product of coercion, manipulation and/or inducements.

83.     Upon information and belief, Defendant Willis, acting in concert with Defendant MPD officers, agreed to lie in his written statements, in oral conversations to prosecutors, and at the grand jury and at trial, in exchange for leniency and/or out of fear of the Defendant MPD officers' coercion and threats.

84.     Defendant Willis received an extraordinarily good plea bargain for the armed robbery of the restaurant.  Although he initially faced a potential life sentence, he was allowed to plead to two lesser offenses, which carried a maximum 15 year sentence. After testifying in Mr. Wright's trial and on the morning that he testified at Mr. Tribble's criminal trial, he was sentenced to two years of probation under the Federal Youth Corrections Act.

85.     Years later, Defendant Willis admitted to Mr. Wright that he had been tricked by the police, and acknowledged that Mr. Wright and Mr. Tribble had done time for crimes they did not commit.

## MPD Defendants Fabricate Inculpatory and
## Bury Exculpatory Ballistics Evidence

86.     Before Defendant MPD Officers learned anything about Mr. Tribble's participation in the sale of a gun, the MPD Firearms Examination Section had already concluded that the Horn and McCormick murder weapon was made by one of three manufacturers: Iver Johnson, H & R, or Hopkins & Allen. Defendants Masson, Greene, Kilcullen, and upon information and belief, Wilson, Voorhees, Leadmon, Mendez, Meehan, Muse, Wood, Hanson, and Dwyer, were all aware of this ballistics analysis.

87.     Defendant MPD officers later learned from the information obtained from Defendant Phillips about the gun, such as the serial number and the gun itself, that the gun Mr. Tribble participated in selling was manufactured by F.I. Industries and sold under the brand name "Kimel."

88.     This should have entirely undermined the MPD's theory that Mr. Tribble participated in selling the .32 caliber gun used in the homicides.   F.I. Industries was *not* one of the three manufacturers that the Firearms Examination Section had previously determined could have made the murder weapon.

89.     After Defendants learned that Mr. Tribble had sold a gun manufactured by FI Industries under the brand Kimel, however, Defendant Masson's opinion changed.  He reported to Defendants Greene and Kilcullen that markings on the Horn and McCormick bullets were very consistent with being fired from a Kimel.

90.     Upon information and belief, Defendant Masson's conclusion that the murder weapon could have been an F.I. Industries gun of brand Kimel was a fabrication created only after Defendant MPD officers learned of Mr. Tribble's gun sale.

91.     Mr. Tribble did not commit the murders; he did not sell a gun that was used in the murders; and the bullets that killed Horn and McCormick had not been fired from the F.I. Industries gun that he sold.

92.     The Firearms Examination Section's formal report setting forth its conclusions, signed by Defendant Masson's supervisor, Defendant Wilson, demonstrates how the officers tailored their opinion to inculpate Mr. Tribble. The report lists the three potential gun manufacturers as Kimel, Harrington and Richardson, or Hopkins and Allen. But Kimel is not a gun manufacturer. Instead, Kimel is one of three different brand names under which guns

manufactured by *F.I. Industries* were sold. Other than their names, the three brands of F.I. Industries guns were identical; nothing distinguished them, except that the gun Mr. Tribble sold happened to be a Kimel.

93.     At Mr. Tribble's criminal trial, Defendant Masson repeated the MPD's inculpatory version of the ballistics analysis: the Horn and McCormick bullets were fired from the same gun, and that gun was made by one of three manufacturers: F.I. Industries, Harrington and Richardson, or Hopkins and Allen. Defendant Masson went even further: he reported to prosecutors and testified that in his opinion the murder weapon was "most likely" the F.I. Industries gun. He made no mention of his earlier, inconsistent report, which did not include F.I. Industries as one of the possible manufacturers.

94.     At no time did Defendants Masson or Voorhees, their supervisor Defendant Wilson, Defendants Greene or Kilcullen, or any other Defendant officer, including Defendants Leadmon, Meehan, and Dwyer, ever disclose to the defense or, upon information and belief, prosecution, the Firearms Examination Section's original, inconsistent conclusion that the murder weapon was made by one of three manufacturers, which did not include F.I. Industries. Instead, Defendant MPD officers and Defendant ballistics officers, acting individually and/or in concert, buried the original, exculpatory ballistics analysis.

95.     Indeed, the formal report setting forth the exculpatory ballistics analysis, which was originally filed in the homicide case jackets for the Horn and McCormick homicides, was not disclosed to the defense or prosecution, and is not in the homicide files today.

96.     Defendants also misrepresented and buried the fact that they ultimately obtained the gun itself. Despite the fact that Defendant Phillips had given Defendant Leadmon the gun, Defendant MPD Officers, including Defendant Leadmon, reported to prosecutors that the gun

21

Mr. Tribble had sold was missing and had likely been stolen. Upon information and belief, Defendant MPD officers coerced Defendant Phillips to repeat the same false story in her witness statements, her conversations with prosecutors, and at trial. None of the Defendant MPD officers disclosed to the prosecution or defense that they had, in fact, obtained the gun.

97.     Upon receipt of the gun, reasonable investigatory practice would require the MPD Firearms Examination Section to have tested the gun.  Had the results of that testing corroborated the MPD's theory that the gun was used in the homicides, that conclusion would have been revealed to the prosecution, the defense, and presented to the jury. The defense would have been entitled to test the gun independently. No such inculpatory results were disclosed or presented to trial. The absence of such results suggests that ballistics testing failed to match the bullets recovered to the gun. Upon information and belief, Defendants, including Defendants Greene, Kilcullen, Leadmon, Meehan, Hanson, Mendez, Dwyer, Masson, Voorhees, and Wilson, acting individually and/or in concert, lied that the gun was missing, and the Defendant MPD officers forced B.J. Phillips to misrepresent and lie about the gun going missing, in order to cover up exculpatory ballistics testing, which would have unraveled their case and exposed their misconduct. Alternatively, Defendants, including Greene, Kilcullen, Leadmon, Meehan, Hanson, Mendez, Dwyer, Masson, Voorhees, and Wilson, acting individually and/or in concert, intentionally failed to conduct ballistics testing on the gun, knowing that it was not the murder weapon, in order to avoid generating exculpatory evidence.

### Mr. Tribble's Wrongful Conviction

98.     In January 1980, Mr. Tribble stood trial for the Horn and McCormick murders.

99.     The prosecution against Mr. Tribble for these crimes relied primarily on the false and coerced witness statements that Defendant MPD Officers had obtained from Defendant

Phillips and Defendant Willis, which Defendant Phillips and Defendant Willis repeated at trial, and the false ballistics evidence.

100.    Although Defendant MPD Officers had obtained statements from both Defendant Phillips and Defendant Willis implicating Mr. Tribble in both murders, at trial prosecutors elicited testimony from Defendant Willis concerning alleged admissions by Mr. Tribble to the Horn murder only.  Prosecutors elicited testimony from Defendant Phillips with respect to both the Horn and McCormick murders.

101.    During her testimony at Mr. Tribble's criminal trial, Defendant Phillips denied, under oath, ever being threatened by Defendant MPD officers with charges for obstruction of justice or as an accessory. She has since admitted that this testimony was false, and that in fact the officers had threatened to charge her with contempt.

102.    In his closing statement, the prosecutor argued that Defendants Phillips and Willis' testimony about the admissions they claimed Mr. Tribble had made, was the "primary evidence" against Mr. Tribble: it "comes from the defendant, himself, not from the witness stand, but the words which he spoke in unguarded moments, not when he was on trial for serious offenses, but in an unguarded moment to friends of his."

103.    The prosecution stressed that the fact two witnesses, rather than one, implicated Mr. Tribble, "is significant," especially because both witnesses implicated Mr. Tribble in the same two crimes, which police knew had been committed with the same gun: "Now, do you think it is a coincidence that Ronnie Willis and B.J. Phillips not only say that Santae Tribble was involved in the killing, but they happen to pick the two killings, of all the killings in Washington or even all the killings in Southeast, they just happened to be the two killings where the two men were killed by the same gun. Could that be a coincidence."

23

104.    The prosecution also emphasized the fact that Defendant Masson testified that it was "more probable" that an F.I. Industries gun, like the one that Mr. Tribble sold, was the murder weapon, and argued to the jury that it could not "be a coincidence" that Mr. Tribble sold this same type of gun after the McCormick murder.

105.    It is not, of course, a coincidence that both Defendant Phillips and Defendant Willis falsely testified to admissions that Mr. Tribble, who was innocent, never made: Defendant MPD officers, acting individually and/or in concert, had coerced, manipulated, and/or induced both Defendant Phillips and Defendant Willis to falsely implicate Mr. Tribble in those crimes.

106.    Nor is it a coincidence that ballistics evidence bolstered the prosecution's case against the innocent Mr. Tribble: upon information and belief, evidence that the gun was possibly, or most likely, an F.I. Industries gun, was fabricated. The Firearms Examination Section's initial, inconsistent ballistics analysis, which would have impeached the testimony at trial, was suppressed. And, Defendant MPD officers, who knew that the gun was sold in July, before the murders, upon information and belief, coerced and/or manipulated Defendant Phillips to testify falsely that the gun was sold in August, after the murders.

107.    Finally, the prosecution presented forensic hair evidence. After Mr. Tribble was arrested and charged with the McCormick and Horn homicides, the FBI falsely reported that one of the hairs found on the McCormick perpetrator's stocking mask matched Mr. Tribble's hair in all microscopic characteristics. A hair examiner at trial explained that this meant the hair "could have originated" with Mr. Tribble, but that he could not say that the hair *was* Mr. Tribble's hair; hair should "not be confused [with] fingerprint identification which is a positive form of identification." The prosecutor argued to the jury that the hair comparison evidence showing that

the hair could have been Mr. Tribble's hair, "strongly corroborated" the admissions testimony from B.J. Phillips and Ronald Willis.

108.    Mr. Tribble testified in his own defense. He truthfully and adamantly denied committing the Horn and McCormick murders, or having anything to do with the murders. He truthfully and adamantly denied ever making admissions to B.J. Phillips or Ronald Willis. And he admitted to selling a gun to Ms. McLean and Ms. Phillips, but testified that he recalled the sale taking place in the beginning of July, not August.

109.    Mr. Tribble also presented strong alibi evidence for both murders.  With respect to the McCormick murder, Mr. Tribble testified that he was asleep at his mother's Seat Pleasant, Maryland apartment at the time of the shooting.  That testimony was corroborated by several witnesses.

110.    Despite the strength of Mr. Tribble's testimony and the evidence showing he was not in Washington, D.C., on the night of the murders, as a proximate result of the above-described misconduct on the part of Defendants, on January 21, 1980, a jury found Mr. Tribble guilty of felony murder while armed and armed robbery of Mr. McCormick. The jury did not vote to convict Mr. Tribble of the Horn homicide.

111.    Mr. Wright was prosecuted for the Horn and McCormick murders in a separate criminal trial in August 1979. At Mr. Wright's trial, the prosecution similarly relied on B.J. Phillips and Ronald Willis's false, coerced and/or otherwise manipulated and induced testimony to alleged admissions by Mr. Wright and the same tainted ballistics evidence as in Mr. Tribble's case. In contrast to Mr. Tribble's trial, however, no inculpatory hair comparison hair comparison evidence was presented: testing by the FBI had excluded Mr. Wright as the contributor of any of the hairs found in the McCormick perpetrator's stocking mask. Despite this exclusion, as a

proximate result of Defendants' above-described misconduct, Mr. Wright was still found guilty of the Horn homicide. Mr. Wright's jury did not vote to convict him of the McCormick homicide.

112.    But for Defendant MPD officers' misconduct in coercing, manipulating, and/or fabricating inculpatory statements from Defendant Phillips, and Defendant MPD officers and Defendant ballistics officers fabricating inculpatory ballistics evidence and failing to disclose exculpatory and impeachment evidence, Mr. Tribble would never have been prosecuted or convicted of the McCormick murder.

113.    On May 12, 1980, Mr. Tribble was sentenced to imprisonment for twenty years to life.

### Mr. Tribble's Exoneration

114.    Throughout his prosecution and following his conviction, Mr. Tribble continuously asserted his innocence and pursued all possible avenues to prove it.

115.    On February 14, 2011, Mr. Tribble filed a motion for post-conviction DNA testing pursuant to the District of Columbia Innocence Protection Act, seeking testing of the hairs found in the stocking mask worn by Mr. McCormick's murderer during the crime. District of Columbia Superior Court Judge Laura Cordero granted Mr. Tribble's motion for DNA testing on August 31, 2011.

116.    The results of that DNA testing fully exonerated Mr. Tribble. Mitochondrial DNA testing excluded Mr. Tribble as the source of not only the particular hair the government had argued at trial matched Mr. Tribble's hair; it also excluded Mr. Tribble as the source of all of the hairs found in the stocking mask, to a scientific certainty.

117.    On January 18, 2012, Mr. Tribble filed a Motion to Vacate Convictions and Dismiss the Indictment with Prejudice under the D.C. Innocence Protection Act on the grounds of actual innocence.

118.    On May 11, 2012, Judge Cordero vacated Mr. Tribble's conviction and dismissed the indictment against him with prejudice. On May 16, 2012, Judge Cordero issued an amended order to specify clearly that the convictions for armed robbery and for felony murder while armed were both vacated.

119.    On December 14, 2012, Judge Cordero granted Mr. Tribble's request for a Certificate of Innocence. Judge Cordero found that, "based on the undisputed evidence in this case, including the new scientific evidence, Mr. Tribble has proved by clear and convincing evidence that he is actually innocent of the charges of armed robbery and felony murder while armed of Mr. McCormick of which he was convicted in this case."

120.    A subsequent December 27, 2012 Order by Judge Cordero further states: "the Court finds by clear and convincing evidence that Mr. Tribble did not commit any of the acts charged, nor did he commit any act, deed or omission in connection with the acts charged that constituted an offense against the United States, or any State, Territory, or the District of Columbia.  Mr. Tribble did not by misconduct or neglect cause or bring about his own prosecution or conviction."

### Pattern and Practice of MPD Misconduct

121.    The misconduct of Defendant MPD officers which led to Mr. Tribble's wrongful conviction was not an isolated incident within the MPD. Before the McCormick homicide and continuing after Mr. Tribble's conviction, on information and belief, the MPD maintained unconstitutional customs, policies and practice of fabricating evidence, coercing and/or

27

manipulating informants and witnesses, withholding material exculpatory and impeachment evidence, and failing to provide minimally adequate training, supervision and discipline to MPD officers concerning these most fundamental responsibilities.

122.    For example, in the case of Donald Gates, in 1981 MPD officers coerced, manipulated, and/or induced a man named Gerald Smith to falsely implicate Mr. Gates in a rape and murder he did not commit. Defendant MPD officers fed Smith nonpublic information about the crime, which falsely give his statement the indicia of reliability, and falsely reported to prosecutors that all of the nonpublic information originated with Smith. MPD officers deliberately withheld exculpatory and impeachment evidence relating to Smith, including the fact that another officer had reported Smith had a reputation for untrustworthiness; that Smith had lied to the MPD in the past; and that shortly before Smith's statement to police regarding Mr. Gates, he had been indicted for felony larceny for stealing money from the MPD and was facing a substantial sentence. On the basis of MPD officers' misconduct, Mr. Gates was wrongly convicted of rape and murder, and served over 27 years in prison for those crimes before DNA testing conclusively proved that he was innocent and he was exonerated.

123.    MPD Officers used the same individual as in the case of Donald Gates in the case of Gregory Britt to generate statements implicating Mr. Britt in a 1979 robbery and murder. Smith claimed that Mr. Britt confessed to him while the two men were incarcerated in the same jail in 1980, coincidentally just shortly after Smith had met with an MPD detective and prosecutor to request leniency. On the stand, Smith admitted that he habitually lied when providing information on the many occasions he was arrested or charged, had lied about his informant status during pretrial hearings, and had used so many aliases with police and prosecutors that he could not remember how many cases were pending against him.

Nonetheless, and although none of the actual eyewitnesses identified Mr. Britt, Mr. Britt was convicted on the basis of Smith's testimony.  He was sentenced to twenty years' to life imprisonment and died in prison. Smith had serious felony charges against him dropped.

124.    On information and belief, MPD officers recruited and rewarded other informants and/or witnesses to provide inculpatory statements the officers knew or should have known to be false. These officers failed to disclose to the prosecution, the grand jury, the court or the defense the coercive and manipulative circumstances and/or inducements used to generate the statements, and/or their knowledge regarding the unreliability of these informants' statements.

125.    On information and belief, the MPD's customs, policies and procedures for utilizing, vetting, and tracking informants and/or witnesses were nonexistent or grossly inadequate and contrary to accepted practices.

126.    If the MPD had customs, policies and procedures for utilizing, vetting, and tracking informants and/or witnesses in line with accepted practices, Mr. Tribble would not have been arrested, prosecuted, convicted or imprisoned for the McCormick murder.

127.    On information and belief, the MPD's training, supervision and discipline regarding the use of informants and/or witnesses were nonexistent or grossly inadequate and contrary to accepted practices.

128.    Had the MPD properly trained, supervised or disciplined its officers regarding the use of informants and/or witnesses, Mr. Tribble would not have been arrested, prosecuted, convicted or imprisoned for the McCormick murder.

129.    On information and belief, the final policymakers for the District of Columbia knew or should have known of these MPD customs, policies and procedures regarding the use of informants and/or witnesses.  In addition, on information and belief, the final policymakers for

the District of Columbia knew or should have known that MPD failed to train, supervise and discipline its employees regarding the use of informants and/or witnesses, despite an obvious need for such training, supervision and discipline, where the District knew that it was foreseeable that MPD officers, detectives and investigators, such as Defendants Greene, Kilcullen, Leadmon, Mendez, Wood, Muse, Hanson, Meehan, and Dwyer, would predictably confront these situations and constitutional violations would result as a consequence of these failures.

**Damages**

130.    The actions of the Defendants deprived Plaintiff Santae A. Tribble of his civil rights under the Fifth Amendment of the United States Constitution.

131.    The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the defendants caused Mr. Tribble to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve over twenty-seven years in prison, and eight years on parole, for crimes he did not commit. Over one and a half years of that time was spent incarcerated pretrial—from his arrest on August 18, 1978 to his sentencing on May 12, 1980.

132.    In addition to the physical injury of being wrongfully imprisoned and confined for over twenty-seven years, Mr. Tribble suffered additional physical harm as a result of his wrongful conviction and unjust imprisonment, including without limitation, serious medical illness and injuries caused by corrections officers. Mr. Tribble suffered emotional distress as a result of his wrongful arrest, prosecution and conviction, his unjust imprisonment, and the physical injuries, described above, that resulted therefrom of such intensity and duration that no reasonable person should be expected to endure it.

133.     In addition, Mr. Tribble suffered the following injuries and damages as a result of Defendants' actions, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; legal expenses; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

134.     All the acts and omissions committed by the Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

**COUNT I**
**5th Amendment Deprivation of Liberty**
**Without Due Process of Law and Denial of a Fair Trial through**
**the Fabrication of Evidence, and**
**the Withholding of Material Exculpatory and Impeachment Evidence**
*Against* Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson, Wood, Muse, Dwyer, Masson, Voorhees, and Wilson.

135.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

136.     Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson, Wood, Muse, Dwyer, Masson, Voorhees, and Wilson, acting individually and/or in concert, deprived Mr. Tribble of his clearly established constitutional right to due process of law and a fair trial through two courses of action which, taken individually and collectively, violated the Fifth

31

Amendment of the United States Constitution: fabricating evidence likely to influence the jury, and suppressing material exculpatory and impeaching evidence.

137.   <u>Fabrication of Evidence:</u>

a.   Specifically, Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson, Wood, Muse, and Dwyer, acting individually and/or in concert, deliberately, recklessly and/or in bad faith coerced, manipulated and/or induced Defendant B.J. Phillips to make false statements inculpating Mr. Tribble in the Horn and McCormick homicides, and forwarded those statements to prosecutors despite knowing the falsity of those statements.  In addition, Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson, Wood, Muse, and Dwyer deliberately, recklessly and/or in bad faith coerced, manipulated and/or induced Defendant Phillips to falsely represent that the gun sold to her by Mr. Tribble was sold in August, after the murders, even though Defendants knew it was sold in July, before the murders.  Furthermore, they deliberately, recklessly and/or in bad faith falsely represented to prosecutors that Defendant Phillips had never given them the gun, despite the fact that Defendant Phillips had given the Defendant MPD officers the gun, and coerced, manipulated, and/or induced Defendant Phillips to falsely maintain that the gun was lost and/or stolen.  On information and belief, these Defendants falsely represented to prosecutors in written and oral reports, in the course of investigating, arresting and indicting Mr. Tribble, and at trial, that B.J. Phillips was the original source of all the information in her statements, that her statements were obtained through properly-conducted interrogations free of coercion, manipulation, and/or inducements, monetary or

otherwise, and that she had independent knowledge of the details in her statement. The false evidence which the Defendants thereby fabricated was introduced against Mr. Tribble at trial, likely influenced the jury, and was a basis for its verdict against him, and thus deprived him of his due process right to a fair criminal trial.

b.   Specifically, Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson, Wood, Muse, and Dwyer, acting individually and/or in concert, deliberately, recklessly and/or in bad faith coerced, manipulated and/or induced Defendant Ronald Willis to make false statements inculpating Mr. Tribble in the Horn and McCormick homicides, and, on information and belief, forwarded those statements to prosecutors despite knowing the falsity of those statements.  These Defendants falsely represented to prosecutors in written and oral reports, in the course of investigating, arresting and indicting Mr. Tribble, and at trial, that Ronald Willis was the original source of all the information in his statements, that his statements were obtained through properly-conducted interrogations free of coercion, manipulation, and/or inducements, and that he had independent knowledge of the details in his statement.  The false evidence which the Defendants thereby fabricated was forwarded to prosecutors, introduced at the grand jury, likely influenced his arrest and prosecution, and thus deprived him of liberty and his due process right to a fair criminal trial.

c.   Specifically, Defendants Masson, Voorhees, and Wilson, acting individually and/or in concert, deliberately, recklessly and/or in bad faith, after learning that the type of gun sold by Mr. Tribble was manufactured by F.I. Industries under the

brand name "Kimel," fabricated inculpatory ballistics evidence. Prior ballistics analysis had determined that the McCormick murder weapon was made by one of three manufacturers, which did not include F.I. Industries; after learning about Mr. Tribble's sale of a gun, Defendants Masson, Voorhees, and Wilson, acting individually and/or in concert with each other, and/or in concert with Defendant MPD officers, deliberately, recklessly and/or in bad faith, substituted F.I. Industries for one of the other three manufacturers and reported that the McCormick murder weapon could have been made by one of three manufacturers, which now *included* F.I. Industries. Defendants forwarded the inculpatory version of the ballistics evidence to prosecutors, and did not disclose their original analysis that the murder weapon was one of three types of guns, not including the one that Mr. Tribble sold. The false evidence which the Defendants thereby fabricated was introduced against Mr. Tribble at trial, likely influenced the jury, and was a basis for its verdict against him, and thus deprived him of his due process right to a fair criminal trial.

138.  <u>Withholding of Material Exculpatory and Impeachment Evidence:</u>  Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson, Wood, Muse, Dwyer, Masson, Voorhees, and Wilson, knowingly and in bad faith concealed these fabrications, use of coercion, manipulation and/or inducements with witnesses, and other material exculpatory and impeachment evidence from prosecutors and the court, jury, grand jury, and defense. The exercise of due diligence by Mr. Tribble and his attorneys could not have led to discovery of defendants' fabrications, and other material exculpatory and impeachment evidence concealed by Defendants.  Had the Defendants' fabrications, and other material exculpatory and

impeachment evidence been documented and/or disclosed, they would have tended to prove Mr. Tribble's innocence, cast doubt on the entire police investigation and prosecution, and impeached the critical trial testimony of Defendants BJ Phillips and Ronald Willis.  The exculpatory and impeachment evidence withheld by the Defendant MPD officers and Defendant ballistics officers, considered individually and collectively, undermines confidence in the verdict against Mr. Tribble, and the concealment of this evidence deprived Mr. Tribble of a fair criminal trial.

139.    As Mr. Tribble has always stated, from the time of his arrest and throughout his unjust imprisonment, he is actually innocent of the McCormick murder.  The wrongful prosecution of Mr. Tribble for McCormick murder finally terminated in his favor on May 11, 2012, when his convictions were vacated and the indictment dismissed on the ground of actual innocence.

140.    The Defendant MPD officers and Defendant ballistics officers committed these acts under color of D.C. law, intentionally, with reckless disregard for the truth and with deliberate indifference to Mr. Tribble's clearly established constitutional rights.  No reasonable officer in 1978, 1979, or 1980 would have believed that the actions taken by defendants to fabricate testimony and evidence and to withhold exculpatory and impeachment evidence was lawful.

141.    As a direct and proximate result of these wrongful actions, Mr. Tribble was unjustly imprisoned for over twenty-seven years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT II
### 5th Amendment Failure to Intercede
*Against* Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson,
Wood, Muse, Dwyer, Masson, Voorhees, and Wilson

142.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and

further alleges as follows:

143.    Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson, Wood,

Muse, Dwyer, Masson, Voorhees, and Wilson had opportunities to intercede on behalf of Mr.

Tribble to prevent the violation of his clearly established constitutional right to due process of

law and a fair trial, but, due to their intentional conduct and/or reckless or deliberate indifference,

declined or refused to do, in violation of the Fifth Amendment of the United States Constitution.

144.    Specifically, Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson,

Wood, Muse, Dwyer, Masson, Voorhees, and Wilson knew or had reason to know that Mr.

Tribble was being denied his constitutional right to a fair trial through the use of fabricated

evidence, false witness statements obtained through coercion, manipulation, and/or inducements,

and the withholding of material exculpatory and impeachment evidence.  They had the

opportunity to prevent his wrongful conviction by disclosing this information, and made no

reasonable attempt to do so.

145.    The Defendant MPD officers and Defendant ballistics officers committed these

acts under color of D.C. law, intentionally, with reckless disregard for the truth and with

deliberate indifference to Mr. Tribble's clearly established constitutional rights.  No reasonable

officer in 1978, 1979, or 1980 would have believed that the actions taken by defendants' failure

to intercede and prevent Mr. Tribble's constitutionally unfair trial was lawful.

146.    As Mr. Tribble has always stated, from the time of his arrest and throughout his

unjust imprisonment, he is actually innocent of the McCormick murder.  The wrongful

prosecution of Mr. Tribble for McCormick murder finally terminated in his favor on May 11,

2012, when his convictions were vacated and the indictment dismissed on the ground of actual innocence.

147.     As a direct and proximate result of these wrongful actions, Mr. Tribble was unjustly imprisoned for over twenty-seven years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III
### Civil Rights Conspiracy
*Against* Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan,
Hanson, Wood, Muse, Dwyer, Masson, Voorhees, and Wilson, Phillips, and Willis

148.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

149.     Defendants Defendants Greene, Kilcullen, Leadmon, Mendez, Meehan, Hanson, Wood, Muse, Dwyer, Masson, Voorhees, and Wilson, Phillips, and Willis, acting under color of D.C. law, agreed among themselves to act in concert in order to deprive Mr. Tribble of his clearly established Fifth Amendment rights not to be deprived of liberty without due process of law and to a fair trial.

150.     In furtherance of the conspiracy each Defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

> a.   Fabricating material, inculpatory evidence in reports and pretrial communications with the prosecution, including Defendant Phillips and Defendant Willis' statements that Mr. Tribble made admissions to the McCormick and Horn murders;
>
> b.   Intentionally or with deliberate indifference failing to comply with their duty to disclose material exculpatory and impeachment evidence to the prosecution during the pendency of the case, including their fabrications and use of coercion;

    c.    Recruiting and inducing Defendant Phillips to provide false testimony during

        hearings and trial; and

    d.    Committing perjury during hearings and trial.

151.    The Defendant MPD officers and Defendant ballistics officers committed these acts under color of D.C. law, intentionally, with reckless disregard for the truth and with deliberate indifference to Mr. Tribble's clearly established constitutional rights.  No reasonable officer in 1978, 1979, or 1980 would have believed that the actions taken by defendants to fabricate testimony and evidence and to withhold exculpatory and impeachment evidence was lawful.

152.    As Mr. Tribble has always stated, from the time of his arrest and throughout his unjust imprisonment, he is actually innocent of the McCormick murder.  The wrongful prosecution of Mr. Tribble for McCormick murder finally terminated in his favor on May 11, 2012, when his convictions were vacated and the indictment dismissed on the ground of actual innocence.

153.    As a direct and proximate result these wrongful actions, Mr. Tribble  was unjustly imprisoned for over twenty-seven years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT IV
### Supervisory Liability

154.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

155.    The unfair trial, wrongful conviction, and continued wrongful detention of Plaintiff were caused by the deliberate indifference and recklessness of supervisory defendants,

including but not limited to Defendants Dwyer and Wilson, when they failed to adequately train and supervise the individual Defendant MPD officers and Defendant ballistics officers.

156.    Specifically, these supervisory defendants were personally involved in the case against Plaintiff and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in the case.

157.    Furthermore, these supervisory defendants failed to supervise the individual defendants in constitutionally adequate law enforcement practices, particularly those which concerned interviews of informants and/or witnesses, and the production of exculpatory and/or impeachment evidence, thereby encouraging and/or permitting these employees and other defendants to coerce and fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Plaintiff.

158.    These interview techniques, failures in producing exculpatory evidence, fabrications and other investigative procedures were contrary to accepted methods used by law enforcement agencies. The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights.

159.    The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages.

160.    The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights. The Defendant MPD officers and Defendant ballistics

officers committed these acts under color of D.C. law, intentionally, with reckless disregard for the truth and with deliberate indifference to Mr. Tribble's clearly established constitutional rights.  No reasonable officer in 1978, 1979, or 1980 would have believed that the actions taken by defendants was lawful.

161.    As Mr. Tribble has always stated, from the time of his arrest and throughout his unjust imprisonment, he is actually innocent of the McCormick murder.  The wrongful prosecution of Mr. Tribble for McCormick murder finally terminated in his favor on May 11, 2012, when his convictions were vacated and the indictment dismissed on the ground of actual innocence.

162.    As a direct and proximate result these wrongful actions, Mr. Tribble  was unjustly imprisoned for over twenty-seven years and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT V**
**Constitutional and *Monell* Claim for**
**Unconstitutional Custom or Policy**
**and/or Failure to Supervise and Train**
*Against* the District of Columbia

163.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

164.    The District of Columbia, by and through its final policymakers, had actual or constructive knowledge that, during the McCormick murder investigation and for years before and after, the Metropolitan Police Department had in force and effect a policy, practice or custom of fabricating evidence and withholding material exculpatory and impeachment evidence through the use of informants and/or witnesses, thus depriving criminal defendants of their

clearly established constitutional rights to due process of law and a fair trial under the Fifth Amendment of the United States Constitution.

165.    The District, by and through its final policymakers, knew or should have known that, as a consequence of this policy, practice or custom, these constitutional violations would result, and their failure correct it amounted to deliberate indifference to the constitutional rights of criminal defendants, including Mr. Tribble, and was the moving force behind Defendant Phillips and Willis' inculpatory statements, causing Mr. Tribble's arrest, prosecution, and incarceration, as well as all the ongoing injuries and damages set forth above.

166.    The District of Columbia, by and through its final policymakers, systemically failed to adequately train its police officers, detectives and investigators not to fabricate evidence, coerce, manipulate, and/or induce informants and witnesses to provide false statements,  or withhold material exculpatory and impeachment evidence from prosecutors.

167.    The District of Columbia, by and through its final policymakers, systemically failed to adequately supervise its police officers, detectives and investigators in obtaining statements from informants and witnesses and in disclosing to prosecutors material information and impeachment evidence favorable to criminal defendants.  MPD employees knew that in this climate of lax supervision, they were free to deviate from constitutional requirements in these areas.

168.    The District of Columbia, by and through its final policymakers, systemically failed to adequately discipline their police officers, detectives and investigators for investigative wrongdoing, though it was highly predictable that constitutional violations of the type Mr. Tribble suffered would result from such failures.

169.     As set forth above, final policymakers for the District of Columbia had actual or constructive notice of such failures to train, supervise and discipline its employees, and failed to provide training or supervision despite an obvious need for such training and supervision, where the final policymakers knew that detectives, officers, and investigators would confront these situations and as a consequence of the failure to train and supervise, it was highly predictable that constitutional violations of the type Mr. Tribble suffered would result.

170.     Such failures to train, supervise and discipline, and such unconstitutional municipal customs, practices and/or policies, amounted to deliberate indifference to the constitutional rights of criminal defendants, including Mr. Tribble, and were the moving force behind Defendant Phillips and Willis' inculpatory statements, causing Mr. Tribble's arrest, prosecution, and incarceration, as well as all the ongoing injuries and damages set forth above.


**RELIEF SOUGHT**

**WHEREFORE**, Plaintiff Santae A. Tribble prays as follows:

A.     That the Court award compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial;

B.     That the Court award punitive damages to him, and against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C.     For a trial by jury on all Counts;

D.     For pre-judgment and post-judgment interest and recovery of their costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.     For any and all other relief to which he may be entitled.

Respectfully Submitted,

_/s/ Jeffrey S. Gutman_____
Jeffrey S. Gutman, D.C. Bar No. 416954
2000 G Street, NW
Washington DC, 20052
(202) 994-5797 (phone)
(202) 994-4693 (fax)
jsgutmandc@gmail.com

Peter J. Neufeld, N.Y. Bar No. 1020841
Nick Brustin, N.Y. Bar No. 2844405
Anna Benvenutti Hoffmann, NY Bar No. 4412011
Alexandra Lampert, NY Bar No. 5085915
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013

Attorneys for Plaintiff Santae A. Tribble

Dated:  May 8, 2015